```
                                              ┌────────────────────────────────┐
                                              │ USDC SDNY                       │
UNITED STATES DISTRICT COURT                  │ DOCUMENT                        │
SOUTHERN DISTRICT OF NEW YORK                 │ ELECTRONICALLY FILED            │
------------------------------------------X   │ DOC #:_____          │
                                          :   │ DATE FILED:__7/23/2020__        │
UNITED STATES OF AMERICA                  :   └────────────────────────────────┘
                                          :
                                          :
            -v-                           :          7:96-cr-323 (LJL)
                                          :
                                          :          OPINION &
RITA GLUZMAN,                             :            ORDER
                                          :
                        Defendant.        :
                                          :
------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

Rita Gluzman, a 71-year-old woman who is currently incarcerated at a federal medical center in Texas, asks the Court to grant her compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). If Ms. Gluzman is released, her sister will rent an apartment for Ms. Gluzman close to her own in New Jersey and will ensure that Ms. Gluzman's medical needs are met. For the reasons below, Ms. Gluzman's request is granted.

## BACKGROUND

### 1. Pre-Trial Facts

In 1948, Rita Gluzman was born in what was then the Soviet Union.[1] She grew up in Chernovtsy, a town located in present-day Ukraine. Her parents were Holocaust survivors. (Dkt. No. 107, Exh. 22; *id.*, Exh. 25.) During Ms. Gluzman's childhood, she suffered a number of traumatic incidents. (*See, e.g.*, *id.*, Exh. 33.) A police officer raped her when she was approximately ten years old. (*Id.*; *id.*, Exh. 20.) Her mother instructed her that they needed to do whatever was needed to survive and that she was never to discuss the rape with anyone. (*Id.*) After the rape, Ms. Gluzman's father was sentenced to internment in a Soviet prison camp. (*Id.*)

---

[1] Unless otherwise indicated, the facts herein are drawn from the Presentence Investigation Report ("PSR").

When Ms. Gluzman was approximately 11 years old, her mother abandoned her for two years, during which time Ms. Gluzman had to care for her younger sister.  (*Id.*; *id.*, Exh. 20.)  Ms. Gluzman sustained herself and her sister by picking through garbage and eating occasional handouts from neighbors—while trying to remain inconspicuous so as not to become wards of the state.  (*Id.*)

Ms. Gluzman met her future husband, Yakov Gluzman, when they were in elementary school.  (*Id.*, Exh. 22; *id.*, Exh. 20.)  She recalls that he was a bully during childhood who would frequently hit her and other children.  (*Id.*, Exh. 33; *id.*, Exh. 20.)  During the fifth grade, Mr. Gluzman threw another student over a second floor balcony, an incident that led Mr. Gluzman to be expelled.  (*Id.*, Exh. 20.)

In the early 1970s, Ms. Gluzman fled the Soviet Union and immigrated to Israel.  (*Id.*, Exh. 33.)  Shortly before doing so, she married Mr. Gluzman.  (*Id.*)  He did not, at that time, have permission to exit the Soviet Union and therefore remained behind.  (*Id.*)  Soon after Ms. Gluzman arrived in Israel, she discovered she was pregnant and later gave birth to a son.  (*Id.*)  She advocated persistently for her husband to receive permission to exit the Soviet Union.  (*Id.*)  At one point in the early 1970s, she traveled to the United Nations and held an 18-day hunger strike.  (*Id.* at 41.)  Her efforts succeeded; he was eventually allowed to immigrate to Israel.  (*Id.*, Exh. 33.)  While in Israel, Ms. Gluzman earned a graduate degree in chemistry from the Weizmann Institute of Science.  Her husband worked in biology.

In 1977, the Gluzmans moved to the United States.  (Dkt. No. 107 at 3.)  She worked as an electrochemist at an engineering firm.  (*Id.*)  He completed postdoctoral work and then worked as a molecular biologist doing cancer research.  In 1987, Ms. Gluzman and her husband co-founded an electronics company called ECI Technology.  She served as the company's

president and directed its day-to-day operations.  He was employed full-time at a different

laboratory but worked at ECI Technology as well, in a non-salaried role.  (Dkt. No. 113, Exh. A

at 3.)  They lived in New Jersey.  (*Id*.)  Although the couple was financially comfortable, the

marriage struggled, as it long had.  (*Id*.)  Ms. Gluzman's husband subjected her to domestic

violence, including choking.  (Dkt. No. 107, Exh. 33.)   At times, he threw her to the floor and

drove his knee into her back until she suffered substantial pain.  (*Id*.)  Mr. Gluzman also

displayed violence towards their son.  (*Id.*, Exh. 20.)  As husband and wife, the two generally

lived separate lives within the same house.

Early in 1995, Mr. Gluzman moved out.  He relocated to a small apartment just across the

New Jersey-New York border—in Pearl River, New York.  Mr. Gluzman tried to negotiate an

out-of-court divorce settlement with Ms. Gluzman but she rejected it.  Meanwhile, he began a

relationship with a woman who lived in Israel.  After Mr. Gluzman moved out, Ms. Gluzman's

son observed that his mother became very depressed.  Discovering her husband's relationship

levied further distress on Ms. Gluzman.  (Dkt. No. 133, Exh. A.)  In the fall of 1995, she hired

private investigators to gather information about the woman in Israel.  Threatening letters

containing photos of Mr. Gluzman and the woman were sent to Mr. Gluzman's father.  Ms.

Gluzman also installed cassette recorders in Mr. Gluzman's apartment.  During this time, the

Gluzmans' divorce litigation was becoming increasingly bitter.  (Dkt. No. 113, Exh. A at 5.)

In early 1996, Ms. Gluzman approached her cousin, a man named Vladimir Zelenin,

about helping her murder her husband.  (*Id.*, Exh. 5.)  Mr. Zelenin had arrived in the United

States from the former Soviet Union in 1993.  His wife, who had remained behind in the Soviet

Union, was killed.  Mr. Zelenin received political asylum in 1995 but was not yet a legal resident.

Ms. Gluzman promised to assist him with his immigration problems and employed him at ECI

Technology.  He became financially dependent on her.

Ms. Gluzman and Mr. Zelenin discussed murdering Mr. Gluzman various times.  They first attempted to kill him in March 1996, waiting for him at his apartment, but he did not return home on that occasion.  On April 5, 1996, Ms. Gluzman told Mr. Zelenin that she wanted the murder to take place before April 7, 1996, when Mr. Gluzman was scheduled to pick up his personal belongings from her house.  They agreed to commit the murder on April 6, 1996 using two axes: one that Mr. Gluzman kept in his home and one that Ms. Gluzman and Mr. Zelenin had purchased from a local store.

On April 6, 1996, Ms. Gluzman and Mr. Zelenin left Ms. Gluzman's home in New Jersey and traveled to Mr. Gluzman's apartment in New York.  They waited for him to arrive home.  She was armed with an axe and hammer; Mr. Zelenin had an axe and knife.  Upon Mr. Gluzman's arrival, Ms. Gluzman and Mr. Zelenin struck him with their weapons until he died.  During the attack, Ms. Gluzman accidentally struck Mr. Zelenin in the right hand, causing him to bleed.  Following the murder, Ms. Gluzman cleaned the apartment while Mr. Zelenin cut up Mr. Gluzman's body into pieces.

On the morning of April 7, 1996, Ms. Gluzman instructed Mr. Zelenin to put the bags of Mr. Gluzman's body parts into Mr. Gluzman's car.  She further directed him to dispose of the bags in a river near the ECI Technology office.  A police officer happened upon Mr. Zelenin dumping the bags into the river and spotted blood on his gloved hand.  (*Id.*, Exh. A at 8.)  He was subsequently arrested and taken to a nearby police station, where he confessed.  (*Id*. at 9.)  For five days, the authorities were unable to locate Ms. Gluzman.  On April 12, 1996, she was discovered in a cabin on Long Island.  Among the items she had with her were: travel guides, a passport, and airline information regarding international flights.  Telephone records revealed that

4

she had contacted numerous international airlines.

On April 18, 1996, Ms. Gluzman was taken into federal custody and charged by complaint.  (Dkt. No. 1.)  She has been in federal custody and detained since that time.

## 2.  Trial and Habeas Relief

On January 6, 1997, Ms. Gluzman was tried by a jury on a five-count superseding indictment.  Two counts charged that Ms. Gluzman conspired to, and actually did, travel from New Jersey to New York with the intent to murder her husband and that, once in New York, she murdered him, in violation of 18 U.S.C. § 2261 (the Violence Against Women Act ("VAWA")).  Two other counts charged Ms. Gluzman with unlawful interception of wire communications in violation of 18 U.S.C. § 2511(1)(a) and unlawful use of a wire to intercept oral communications in violation of 18 U.S.C. § 2511(1)(b).  The final count charged Ms. Gluzman with traveling interstate and internationally in furtherance of a plan to commit extortion in violation of 18 U.S.C. § 1952(a)(3).  After a 16-day trial, the jury returned a verdict finding Ms. Gluzman guilty of the VAWA and interception charges, but not guilty of the extortion charge.

Then-District Judge Barrington D. Parker presided over the trial and, on April 30, 1997, sentenced Ms. Gluzman to life imprisonment pursuant to the then-mandatory Sentencing Guidelines.  Immediately following the announcement of the sentence, Ms. Gluzman said, "I'm his wife.  His wife is entitled.  I am his wife.  Your Honor, I did not do it and I still say that in front of the world.  I did not."  (Dkt. No. 107, Exh. 6.)

On appeal, the Second Circuit upheld Ms. Gluzman's conviction.  *United States v. Gluzman*, 154 F.3d 49 (2d Cir. 1998).  Her post-conviction collateral attack under 28 U.S.C. § 2255 was also unsuccessful.  *Gluzman v. United States*, 124 F. Supp. 2d 171 (S.D.N.Y. 2000).

3. **Post-Trial Facts and Compassionate Relief Motion**

   A. **Physical and Mental Health**

   In support of her motion for compassionate release, Ms. Gluzman has submitted a

declaration from neurologist Dr. Naomi Feuer.  (Dkt. No. 112.)  Dr. Feuer reviewed Ms.

Gluzman's medical records and provided summarizing descriptions as well as treatment

opinions.  The Government has proffered no objection to Dr. Feuer's opinions and has not

submitted a counter-declaration.  The Court has independently reviewed the medical records that

have been submitted.  The following facts reflect consideration of those records and of the

opinions of Dr. Feuer that the Court has deemed credible.

   Ms. Gluzman was 48 years old when she entered federal custody at FCI Danbury, a low-

security correctional institution in Danbury, Connecticut.  (Dkt. No. 107 at 5; *id.*, Exh. 7.)  At

that time, she was in generally good physical health.  (*Id.*; *id.*, Exh. 33.)  Around September 27,

2001, however, Ms. Gluzman experienced an Acute Cerebral Vascular Accident ("Acute

CVA")—a stroke—attributable to a blood clot that formed in her brain after she began taking an

oral contraceptive to treat symptoms of menopause.  (*Id.*; *id.*, Exh. 9; Dkt. No. 113 at 11; Dkt. No.

112.)  In early October 2001, she was transferred to Federal Medical Center Carswell ("FMC

Carswell") in Fort Worth, Texas, where she is currently held.  (Dkt. No. 107, Exh. 7.)  Since that

time, she has suffered from several serious medical conditions.  (Dkt. No. 113 at 9; Dkt. No.

112.)

   For example, Ms. Gluzman has experienced numerous transient ischemic attacks

("TIAs")—or mini strokes—which cause confusion, vertigo, tingling in the left extremities, and

slurred speech.  (Dkt. No. 107, Exh. 33.)  Between 2002 and 2017, TIAs have put Ms. Gluzman

in the hospital ten times.  (*Id.*)  Many of Ms. Gluzman's current conditions are common

6

neurological consequences of the type of strokes she has had.  Those include: weakness to left-side extremities, abnormal sensations on the left side of the body, spatial disorientation (including problems with depth perception), and misjudgment in movement and balance.  (Dkt. No. 112.)  Ms. Gluzman has also experienced the common post-stroke complications of depression, shoulder pain, pulmonary symptoms, chest pressure, and urinary incontinence.  (*Id.*)  There is documentation of cognitive impairment as well.  (*Id.*)

In addition to post-stroke complications, Ms. Gluzman has been diagnosed with early Parkinson's disease.  (*Id.*)  The disease affects the right side of her body, which is the side that remained intact after the 2001 stroke.  (*Id.*)  Parkinson's disease is "a chronic progressive disorder of the extrapyramidal motor system caused by degenerative loss of dopaminergic neurons in the brain and characterized clinically by asymmetric parkinsonism."  (*Id.*)  "Parkinsonism refers to a clinical syndrome presenting with any combination of bradykinesia (*i.e.*, slowness of movement), resting tumor, rigidity, and postural instability."  (*Id.*)

Ms. Gluzman's medical records also indicate that she has been diagnosed with a mood disorder, posttraumatic stress disorder ("PTSD"), and atypical depression.  (*Id.*)  She is precluded from taking any psychiatric medication, however, because there is potential for dangerous interaction with the drug that the Federal Bureau of Prisons ("BOP") has prescribed to treat her parkinsonism.  (*Id.*)  In other words, "she can either treat her Parkinson's disease or she can treat her depression."  (Dkt. No. 107, Exh. 10.)  Despite mental health challenges, Ms. Gluzman has not evidenced violent tendencies while incarcerated.  (*Id.*, Exh. 37.)

Ms. Gluzman has trouble standing up and walking.  She relies on a roller walker or wheelchair to move around.  (*Id.* ("[S]he has difficulty maneuvering and walking[.]"); *id.*, Exh. 11 ("[T]he patient reports that she is having difficulty walking.  She says her legs feel like

7

cement . . . I could not have her stand and walk."); *id.*, Exh. 12 ("[W]hen she walks with the

rolling walker, she is dragging her foot."); *id.*, Exh. 15 ("difficulty standing even with her walker

for extended periods"); *id.*, Exh. 22 ("ambulatory only with a walker")).  She also has difficulty

with her right arm and drops things.  (*Id.*)

The following is a list of Ms. Gluzman's presently known medical conditions:

- basal cell carcinoma on her left cheek and scalp

- chronic pain syndrome

- hypertension

- high cholesterol

- cataracts in both eyes

- chronic erosive gastritis

- temporomandibular joint disorder ("TMJ")

- parenchymal scarring of the lungs

- severe degenerative spondylosis

- pancreatic insufficiency

- PTSD

- chronic depression.

(*Id.* at 7–8.)

### B.  Character and Social Contributions

The Court has received 20 letters in support of Ms. Gluzman's motion for compassionate

release.  (*See* Dkt. No. 107.)  Ms. Gluzman herself has also written to the Court.  (*Id.*, Exh. 3.)

Her letter begins as follows:

I am a 71-year-old disabled, G-D fearing woman who spent 24 years filled with

8

pain and tears in prison. I am writing to ask you to give me a second chance, so that I do not have to die in prison. My involvement in the criminal acts outlined in my case do not reflect the woman facing you now. I have gone from a healthy, active, productive woman in her 40's to a sick, elderly person who requires a wheelchair to get around. I am afflicted by numerous ailments and in constant debilitating pain. I am currently over 1,500 miles away from my family, ex co-workers and friends.

Despite my physical disabilities, I have done the best I could to improve myself and grow as a person over almost a quarter of a century in prison. These disabilities began after I was given contraindicated medication at FCI Danbury. Despite my limitations and pain, I have found hope and purpose in serving the prison's religious community and being a mentor to other women in both Danbury and Carswell prisons.

(*Id.*)  The other letter writers, who hold diverse stations in life and relationships with Ms. Gluzman, emphasize the ways that Ms. Gluzman has contributed to her prison community over the years.  They also describe their opinions of Ms. Gluzman's character.  A summary of highlights appears below:

- Stacey A. Coe, who met Ms. Gluzman in 2000 when they were incarcerated together, writes that Ms. Gluzman was "a mother figure[,] . . . always encouraging me and building me up."  (*Id.*, Exh. 1.)  She explains that Ms. Gluzman "took the time to tutor me in the Hebrew language" and that "[h]er time, attention, help and guidance were the things I needed to get myself on the right path."  (*Id.*)

- Ms. Coe's father, in a separate letter, explains that Ms. Coe "became involved with drugs at the very early age of 13" and that, "[d]espite years of therapy," including "nine months in a residential treatment center," she "was not able to shake her drug addiction."  (*Id.*, Exh. 2.)  But "[s]omehow [Ms. Gluzman] was able to reach [Ms. Coe] in a way nobody had ever been able to do."  (*Id.*)  Ms. Coe's father credits Ms. Gluzman's influence as the "single event" that "placed [Ms. Coe] on the right path towards sobriety."  (*Id.*)

- Dr. Russ Wood, a clinical psychologist who worked for the BOP for over 24 years, provides his "steadfast opinion that Ms. Gluzman poses no risk of harm to others nor does she pose a threat to society."  (*Id.*, Exh. 20.)  He "strongly believe[s]" that she should be grated compassionate release.  (*Id.*)  He identifies her as "the inmate who was primarily responsible for organizing worship services and activities for the Jewish faith group at FMC Carswell."  (*Id.*)  He observed that she would "often spend time talking with both medical and psychiatric patients who were having difficulties and assist them either by listening or helping them to obtain or request services to

address their needs." (*Id.*) Specifically, he is "aware of many inmates who needed and ultimately opted to obtain treatment from psychology who likely would not have done so without the urging of Ms. Gluzman." (*Id.*)

- Rabbi Vivie Mayer describes meeting Ms. Gluzman at FCI Danbury in 1996 and corresponding by mail subsequently, for the past 24 years. (*Id.*, Exh. 21.) He recalls witnessing her "angst and frustration" early on but how, "over the years," Ms. Gluzman "learned humility, acceptance, and the ability to stay present with her pain, psychically and physically." (*Id.*)

- Reverend Robert G. Danage, the Supervisory Chaplain at FMC Carswell, writes that Ms. Gluzman is "very active in participating in various religious programs and activities" and that, "without any hesitation," he believes that she is able to live a crime-free life. (*Id.*, Exh. 23.) He reports that she "is determined and resolute about making good on her faith commitment," that she is "a person of high character and moral virtue," that she is "sincere," and that she "desires to pour her life into the lives of others[.]" (*Id.*)

- Rabbi Borouch Zelouf, an advocate with the Aleph Institute (a 39-year-old Jewish NGO in the correctional arena) writes that Ms. Gluzman "is always checking in on [him] and [his] family," which "sticks out" to him because "often [his] work in advocacy is limited in the sense where clients are only looking out for their own welfare." (*Id.*, Exh. 24.) He writes that she "has shown an incredible amount of remorse for her past deeds as well as unbelievable strides toward a positive future." (*Id.*)

- Sandra Reeder, formerly incarcerated with Ms. Gluzman, writes that Ms. Gluzman "had a fire for life, quality and excellence, depth and dedication," and that Ms. Reeder "caught on"; "I caught it from her." (*Id.*, Exh. 26.)

- Elvira Gonzalez, also formerly incarcerated with Ms. Gluzman, recalls that when Ms. Gonzalez's father passed away, "Rita prayed and mourned with [her] as if she had lost a family member of her own." (*Id.*, Exh. 27.)

- Beatrice Codianni, who too met Rita in prison, explains that Ms. Gluzman "was always ready to help women struggling with GED classes" and "did so in a way that gave the women faith in themselves to accomplish their goals." (*Id.*, Exh. 28.) Ms. Codianni "join[s] the many others who support Rita's release from prison and who will do all [they] can to help her with successful reintegration back into the community." (*Id.*)

- Dr. Farid Farooqui, staff chaplain at FMC Carswell, writes that Ms. Gluzman "could be a great asset as an employee/Worker for any religious or non-religious institutions and departments." (*Id.*, Exh. 29.)

- Rina Coronado, who knew Ms. Gluzman in prison, writes that Ms. Gluzman "never fails to ask about [Ms. Coronado]'s family" and that, while Ms. Coronado was at first "angry, bitter, and miserable," Ms. Gluzman never "[gave] up on [her]" and became like a "second mother." (*Id.*, Exh. 30.)

- Ms. Coronado's mother writes that she, too, thinks of Ms. Gluzman as Rina Coronado's "second mother." (*Id.*, Exh. 43.) She calls Ms. Gluzman "a blessing in [her and her daughter's] lives," and she "cannot think of anyone more deserving and caring" to be "released and reunited with her family." (*Id.*) Ms. Coronado's mother "truly believe[s]" that Ms. Gluzman "saved [her and her daughter's] lives" and she thinks "the world would be so much greater if we had many, many more Rita Gluzman's." (*Id.*)

- Marianna Rabinovitch, Ms. Gluzman's younger sister, explains that, "[f]rom a very young age," Ms. Gluzman "took on herself the full responsibility of taking care of [Ms. Rabinovitch]." (*Id.*, Exh. 36.) Ms. Rabinovitch pledges to "make sure that [Ms. Gluzman] receives the care and attention that she needs" if she is released. (*Id.*) Ms. Rabinovitch will "rent an apartment for Rita close to my home and pay for the services of a home health aid to help care for Rita." (*Id.*) She will "make sure that Rita obtains the best medical care for her many serious health issues," "talk to Rita daily," and "visit her as often as possible." (*Id.*)

- Robert Russell, a retired Air Force officer who is involved in many ministries, participated in a prison visit program with Ms. Gluzman and characterizes her as "a changed person." (*Id.*, Exh. 42.) He has met hundreds of incarcerated individuals over the years and is "confident" that Ms. Gluzman "is no threat to society." (*Id.*) Mr. Russell has "met many prisoners who are full of hate and bitterness, who harbor revenge, and who," in his view, "should remain locked up" but he reports that Ms. Gluzman is not one of them. (*Id.*) He senses that "she has become a much different person than at the time of her conviction" and, while he does not believe that "all prisoners . . . deserve to be released early," he fully supports release for Ms. Gluzman at this time. (*Id.*) He "stand[s] by to do whatever [he] can to help make that a reality." (*Id.*)

- Rabbi Shmuel Spritzer, who heads the prison division in the United States for the Lubavitch Jewish Outreach Organization, notes that the organization "seldom write[s] on behalf of any inmate," but has made an exception for Ms. Gluzman. (*Id.*, Exh. 45.) The reason for the exception is that he noticed "a real and sincere change for the better" as Ms. Gluzman became "a more positive and productive citizen" (*Id.*) He writes that she "is definitely not the same person she was when she first entered the prison system" and that he "strongly believe[s] that she "deserves another chance to become a member of society." (*Id.*)

- Rabbi Sidney Zimelman, who has known Ms. Gluzman for 18 or 19 years in his capacity as a volunteer, saw that she "sincerely cared about her friends and tried to

guide them in commendable pursuits." (*Id.*, Exh. 47.) "She always encouraged them to be constructive and productive members after they had served their sentence and strive to become paradigms of excellence for their communities." (*Id.*) In his "heart of hearts," he sincerely believes that "Ms. Gluzman shares the deepest empathy for those who suffer from alienation, unfounded rejection, and overwhelming struggles with physical and psychological issues." (*Id.*) In his assessment, "[s]he has the instinct and motivation to heal." (*Id.*)

But the Court has received two contrary letters, both of which are significant. Michael Gluzman, the brother of Mr. Gluzman, writes that the news of Ms. Gluzman's possible release "horrified" his "whole family." (Dkt. No. 116, Exh. B.) He views Ms. Gluzman as "a monster capable of anything" and someone who "will not rest until she gets revenge regarding anyone who she thinks is responsible for her arrest." (*Id.*) In closing, he writes:

> I am convinced that if she is released, I would live out my life in fear for myself and my children. I am now in the process of going through cancer treatment and the news about her possible release from prison severely affected my emotional well-being. All these years I believed in the American Justice System and in the fairness of this system. Therefore, I ask not to bring up the issue of releasing this person from custody ever again and to extend her time in prison.

(*Id.*)

The Court has also received a letter from the son of Mr. Gluzman and Ms. Gluzman— Ilan Gluzman ("Ilan"). He rejects that, around the time of the murder, "the divorce was weighing on [Ms. Gluzman]" and believes that, instead, "she was not well because she was having trouble planning the most horrendous event in [his] and [his] family's existence." (*Id.*, Exh. A.) He recalls how his father was a "unique individual with a strong character and a sense of humor," as well as a "world-renowned Scientist." (*Id.*) He writes:

> To read her spending her "Golden years" in hardship strikes me as self-centered to the worst degree. What about my father's "Golden years?" Her self-centeredness enables her to ignore how she imposed on my Grandfather's "Golden years!" A big man who had not cried since WW2, cried every time he saw me because I reminded him of his lost son. My Grandmother's "Golden years" were likewise full of tears as I reminded her of my mother. And even Ms. Rita's own mother's "Golden years" were filled with shame and tears. As usual, Ms. Rita ignores everyone other than herself.

12

(*Id.*)  Turning to the psychiatric and medical reports about Ms. Gluzman, he adds:

> I cannot comment directly on the Psychiatric and Medical reports. But I do know
> that she is a deceiver and a corruptor. Thusly, she will exaggerate any condition
> with any Psychiatric or Medical professional to enable and further her appeal. As
> I know, she is a quick study of what is to her advantage. After I buried my
> father's 63-pieces, and throughout the years, I have visited Ms. Rita over 20
> times. When I read, Ms. Rita's is "very regretful for the past," I immediately
> jump to one conclusion: The only thing she regrets is getting caught. Each time I
> visited her, I sought any word of contrition so that I may forgive her. She was
> deceitful, conspiratorial, but never regretful. I hope someday she is honestly
> contrite with me and I have the heart to forgive her. Until then, I respectfully ask
> that you deny the request for compassionate release.

(*Id.*)

Appended to Ilan's letter to the Court are two letters that he wrote to his mother during

April 2020.  The first letter excoriates Ms. Gluzman for failing to ask for "forgiveness" or

"mercy" and for failing to offer "any kind word regarding the damage [she] caused [him]."  (*Id.*)

He writes:

> I have given you 24 years to confess your sins, to confess your misdeeds, to
> confess your lies and treachery. All your words of conspiracy about Zelenin, the
> simpleton, taking control! You are the great Deceiver and great Corruptor. You
> are the mastermind of Yasha's murder. You are the only cause of my family's
> suffering!

(*Id.*)  He also writes that he remembers asking himself whether it was possible that she could

have committed the murder.  (*Id.*)  Recalling "all of the disgusting and *disrespectful* behavior

[she] showed inside and outside the home," how "[e]veryone in the family despised [her]," how

she "had no friends," how "[e]veryone at work disrespected [her] behind [her] back," the answer

became "clear: 'Yes, my mother could have plotted, and directly participated in the kill of my

father.'"  (*Id.*)  At the conclusion of one letter, he writes:

> I break my 24 years of crushing sadness to announce today, you destroyed my
> life, love, and happiness for 24 years! For 24 years you tortured me with lies and
> lack of contrition. I lived stuck in the self-pity and mental disease you triggered.
> But maybe no longer! I break my 24 years of self-pity to announce today, you are

13

a Destroyer of all you hold close!

(*Id.*)  Ilan's second letter calls Ms. Gluzman "wicked" and emphasizes her "greed," "anger," and

"betray[al]."  (*Id.*)  He writes:

> Now, Ms. Rita attempts to crawl out of the depths to torment her only child once
> more. Having never shown any repentance. Having never shown any remorse.
> Having never shown any contrition, she will never rest until she strikes her
> victims again.

(*Id.*)

### C.  Motion for Compassionate Release

At some point prior to June 28, 2019, Ms. Gluzman applied to the warden of FMC

Carswell for compassionate release on the basis of having a "debilitated medical condition."

(Dkt. No. 107, Exh. 32.)  On June 28, 2019, the warden denied her request for principally the

following reason:

> Currently, you do not meet the criteria for a Reduction in Sentence based on
> Medical Circumstances – Debilitated Medical Condition. A review of your
> current medical summary reflects that you are not confined to a bed or chair more
> than 50% of waking hours and you are able to complete self-care activities
> independently, including feeding, bathing, and dressing.
>                                    . . .
> Medical staff will continue to monitor your conditions as clinically indicated. I
> suggest you continue to work with your unit team, your designated medical team,
> and your assigned social worker to address your needs, as they may arise.

(*Id.*)  Ms. Gluzman appealed on the basis of having a terminal medical condition.  (*Id.*, Exh, 33.)

On July 12, 2019, the warden denied her appeal.  The decision stated: "Although you have a

medical condition, a review of your condition does not necessitate an end-of-life trajectory."

(*Id.*)  Ms. Gluzman appealed again, through the BOP's Administrative Remedy Program.  (*Id.*,

Exh, 33; *id.*, Exh. 34.)  That appeal was denied as well.  (*Id.*, Exh. 34.)  The decision, which was

dated December 21, 2019, stated: "You are 71 years old and a review of your medical history

indicates that you are able to perform your activities of daily living (ADLs) and that you are not

14

confined to a bed or chair more than 50 percent of waking hours." (*Id.*)

On June 2, 2020, Ms. Gluzman filed the instant motion for compassionate release (the "Motion"). (Dkt. No. 107.) The Motion was originally assigned to Judge Parker but, pursuant to Standing Order M10-468, it was reassigned to the undersigned. (Dkt. No. 111.)

The Motion opens with the argument that "the circumstances that support Ms. Gluzman's 'compassionate release' easily satisfy the statutory 'extraordinary and compelling' test, even without considering the COVID-19 pandemic." (Dkt. No. 107 at 1.) It offers three reasons why the "extraordinary and compelling" test is satisfied: (1) Ms. Gluzman's serious medical condition, (2) her age, deteriorating physical and mental health, and time already served, and (3) other facts and circumstances including COVID-19 and Ms. Gluzman's good moral character and exemplary conduct while incarcerated. (*Id.*) The Government opposes the motion on various grounds. (Dkt. No. 113.) First, the Government argues that Ms. Gluzman has failed to exhaust administrative remedies. (*Id.* at 7.) Second, the Government urges that Ms. Gluzman has failed to present "extraordinary and compelling" reasons for compassionate release. (*Id.* at 9.) Finally, the Government presses that the factors the Court must consider under 18 U.S.C. § 3553(a) weigh against her early release. (*Id.* at 15.) Ms. Gluzman has filed a reply. (Dkt. No. 115.)

## LEGAL STANDARD

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. Jan. 15, 2020). Section 3582(c) of Title 18 permits courts to modify an imposed term of imprisonment. Specifically, in relevant part, it provides that "[t]he court may not modify a term of imprisonment once it has been imposed except that—

15

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

18 U.S.C. § 3582(c).

The "applicable policy statements issued by the Sentencing Commission" are found in

U.S.S.G. § 1B1.13.  That section of the Guidelines states, in relevant part:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Application Note 1 to U.S.S.G. § 1B1.13 provides, in relevant part:

Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

16

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Application Note 1, U.S.S.G. § 1B1.13.

Application Note 4 explains that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community."  Application Note 4, U.S.S.G. § 1B1.13.  As is plain from the text quoted above, U.S.S.G. § 1B1.13 has not been amended since the First Step Act amended 18 U.S.C. § 3582 to permit a defendant to move for

compassionate release over the objection of the BOP.

Separate from the statute and the Sentencing Guidelines, the BOP has issued its own guidelines (the "Program Statement") for deciding whether to file a motion for reduction in sentence on a prisoner's behalf. *See* Fed. Bureau of Prisons, U.S. Dep't of Justice, *Program Statement 5050.50: Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)* (2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Section 3(b) of the Program Statement discusses what the BOP considers to be a "debilitated medical condition" warranting a motion for sentence reduction. *Id.* It provides that the BOP should consider making such motion if the inmate is:

- completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or

- capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.

*Id.*

### DISCUSSION

## 1. Exhaustion of Administrative Remedies

18 U.S.C. § 3582(c)(1)(A) provides that "[t]he court may not modify a term of imprisonment" until one of the following three events has occurred: "motion of the Director of the Bureau of Prisons"; "motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf"; or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.

In this case, it is undisputed that Ms. Gluzman "fully exhausted her administrative remedies with respect to her application on the basis of her purportedly debilitated medical

18

condition, which is the relevant application for the purposes of this motion." (Dkt. No. 113 at 7.) But, the Government asserts, "The defendant made no further applications for compassionate release to BOP following the outbreak of COVID-19 in the United States. Nor does it appear that the defendant has applied to BOP for compassionate release at any point on the basis of her purported rehabilitation." (*Id.*) "Accordingly," the Government argues, "the defendant has not exhausted her administrative remedies[.]" (*Id.*)

The Government's reading of the exhaustion requirement is flawed. The Government writes two caveats into the text that are not there: particularity and expiration. On particularity, the Government apparently reads 18 U.S.C. § 3582(c)(1)(A) to require that a defendant must separately exhaust compassionate release requests for every specific basis on which release is sought. And, on exhaustion, the Government apparently would read into the statute a notion that the defendant must bring her motion for compassionate release within some vague, unspecified time period after the BOP has decided not to bring a motion or 30 days have lapsed from a request to the BOP, or she must start the process again.

As a matter of statutory interpretation, however, the statute contains no requirement that the basis for the defendant's motion for compassionate release to the court be identical to the basis of the defendant's request to the warden of the BOP to bring a motion on the defendant's behalf. Under Section 3582(c), the court may reduce a term of imprisonment upon motion of the defendant alone (and without the BOP) after either (1) the defendant "has fully exhausted all administrative rights to appeal *a* failure of the Bureau of Prisons to bring *a* motion on the defendant's behalf" or (2) 30 days have lapsed from "the receipt of such *a* request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). Congress's use of the indefinite article "a" rather than the definite article "the" was advised. The Supreme Court and

federal appellate courts have instructed that Congress's word choice must be honored. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.") (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)); *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir. 2013) (examining the difference between "the word choice 'recess' and 'the Recess,'" noting that "the," "unlike 'a' or 'an,'" is a "definite article" that "suggests specificity"); *id.* ("This is not an insignificant distinction. In the end it makes all the difference."). A defendant is entitled to make a motion under Section 3582(c) after the BOP has refused to "bring *a* motion on the defendant's behalf" or after 30 days have passed since the warden's receipt of "*such a request*" (to bring "a" motion on the defendant's behalf). The statute does not require the defendant to present "the" precise motion she intends to file in federal court to the BOP before she files that motion in federal court. Nor does the statute require her to restart the process if she seeks the same ultimate relief from the court (as she does through her request to the warden) but on somewhat different, or differently articulated, grounds. For that matter, it does not limit the motion for release that the BOP makes on behalf of the defendant to the motion that the defendant has asked to be made.[2]

As a distinct but related matter, the statute does not impose a time limit within which a defendant may move the court after having made a request to the BOP. All that is required is for the administrative appeal process to conclude or for 30 days to elapse from the warden's receipt of a compassionate release request. At that point, exhaustion has occurred and the court may

---

[2] Thus, if the BOP grants the defendant's request to make a motion to the court for compassionate release, it too can articulate all of the grounds it believes there are to support a sentence modification, regardless of whether those same grounds were stated in the defendant's request to the BOP. The Government's construction of the statute could lead to the opposite, untenable conclusion.

modify the term of imprisonment. *See United States v. Resnick*, 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020) ("[T]he Government insists that Resnick has not exhausted because the operative administrative request for Resnick is one submitted on his behalf by his attorney on March 28, which (unlike his February 26 request) relies specifically on his particular susceptibility to COVID-19.  The Government's argument is sheer sophistry. Resnick has exhausted.  He submitted a request to the Warden; more than thirty days passed since he did so; the Warden failed to act within those thirty days; so he filed an appeal to this, his sentencing court, as is his right under the First Step Act. That alone was enough.").  Section 3582 thus stands in stark contrast to those statutory regimes where Congress has required a plaintiff to file a judicial motion within a specified time following administrative action or inaction. *See, e.g.*, 42 U.S.C. § 2000e-5(f)(1) (Title VII litigants must file an action in federal court *within 90 days* of receiving a right-to-sue letter from the agency).  No such time limitation appears in the exhaustion requirement of 18 U.S.C. § 3582(c).

So understood, the plain language fits comfortably within the statutory scheme.  "The plain language of Section 3582(c) evinces congressional intent that a defendant has a right to a . . . meaningful judicial determination of whether she should be compassionately released . . . It does not reflect unqualified commitment to administrative exhaustion and it does reflect acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *United States v. Russo*, 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020).  The court does not sit in review, like an appellate court, of the BOP's decision whether to file its own motion on the defendant's behalf; it permits a defendant to make a motion even if the BOP has not made a judgment on the defendant's application for compassionate release, as long as 30 days have lapsed.  The court then exercises its independent

judgment on that motion.  If the BOP moves for compassionate release, the court will not necessarily grant that motion because the BOP has decided to make it, nor will it give the BOP any special deference.  It will independently review the record to determine whether a sentencing reduction is appropriate under the standards that Congress has established.  Likewise, if the BOP has denied a request that it move for compassionate release on behalf of a defendant, the court reviewing the defendant's motion is not bound by the BOP's judgment.  It will exercise its own judgment.

The premise of the Government's argument therefore is mistaken.  The statute does not require the defendant to obtain the BOP's "initial assessment" or "judgment[]" before presenting a motion to a court, nor does it limit the court to the review it would conduct of an agency decision.  (Dkt. No. 113 at 8.)  The statute permits a defendant to make a motion even if no assessment or judgment is made.  And, because the statute does not restrict the defendant to making a motion only when the BOP has made an initial assessment or passed judgment on the request for a motion, there is no particular value in limiting the motion a defendant can make to one based on the precise grounds presented to the BOP.

Indeed, there is reason to believe that the Government's argument runs in tension with Congress's objectives.  In the first place, at least at the BOP stage, and frequently thereafter as well, defendants seeking compassionate release are often *pro se*.  It would be wholly inconsistent to require a defendant to formulate at the BOP stage all of the grounds upon which she will later seek relief at the judicial stage—with the consequence that, if the defendant fails to do so, she will have to make a new request to BOP and start the process all over again. In the second place, as this order and those of numerous other courts demonstrate, the considerations that move a *court* to grant compassionate release may be different from those that would move the BOP.  *See*

22

*United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) (noting that "the Court may *independently* evaluate whether [the defendant] has raised an extraordinary and compelling reason for compassionate release") (emphasis added); *United States v. Ebbers*, 432 F. Supp. 3d 421, 423 (S.D.N.Y. 2020) (noting that the "history and text of the First Step Act suggest that Congress intended to broaden the availability of compassionate release"). The court is not bound by the BOP's Program Statement or other interpretations of the Sentencing Guidelines (more on this below); the court gives the Guidelines and the statute, as well as the facts, an independent read. There is thus no reason to think Congress would have wanted to prevent a defendant from framing her motion in a manner intended to address the concerns of the court merely because, when she was in front of the BOP which did not share those same concerns, she did not make the same arguments.

Further, there is no reason to believe (or to ascribe a belief to Congress) that this interpretation of Section 3582(c) will lead to abuse. In all but the most exigent or challenging circumstances (which these may be), a defendant who has entirely new grounds for a motion for compassionate release should be motivated to request that the BOP make a motion on those grounds, even without any statutory requirement to do so. As a matter of statutory construction, the right to make a request to the BOP and for the BOP to make a motion to the court provides an additional avenue for relief. As a practical matter, it would usually only help a defendant to make such a request; no doubt, a request joined by the BOP will generally be more favorably received than one which the BOP has opposed or not addressed. And, if the BOP ultimately decides not to make a motion, the defendant will be no worse off. She will still be entitled to the same independent judicial review.

Congress addressed a similar but not identical exhaustion issue in the context of Title

VII.   "Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to exhaust the administrative remedies provided by the statute." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018).  Specifically, a Title VII plaintiff generally must file a charge of discrimination with the EEOC and receive a right-to-sue letter before bringing the claim in federal court.  *See* 42 U.S.C. § 2000e-5(e)(1); *id*. § 2000e-5(f)(1).  But new violations might occur after a plaintiff requests the right-to-sue letter, before she files the federal court complaint—just as new extraordinary and compelling reasons might develop after a defendant petitions the warden, before she moves the sentencing court for compassionate release.  In the Title VII context, the Second Circuit has "long recognized that in certain circumstances it may be unfair, inefficient, or contrary to the purposes of the statute to require a party to separately re-exhaust new violations that are 'reasonably related' to the initial claim." *Duplan*, 888 F.3d at 622 (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993)).  "The 'reasonably related' exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003)).  What matters under the "reasonably related" doctrine is whether the "specific factual allegations put the EEOC on notice that . . . a [certain] claim may . . . exist," not whether the complainant has identified the particular theory of liability that she subsequently brings to federal court.  *Id.* (holding that it was erroneous for the district court to conclude that a discrimination claim was unexhausted when the factual allegations supporting the plaintiff's retaliation claim put the EEOC on notice that a discrimination claim might also exist).  Although

24

the analogy is imperfect, it follows that, at a minimum, similar considerations feature here.

The Court need not now consider whether a judicial motion that is wholly unrelated to the BOP request would satisfy the statutory exhaustion requirements. This case fits comfortably within the "reasonably related" rubric. The Government complains that Ms. Gluzman did not seek compassionate release from the BOP on two bases that are now before the Court: COVID-19 or her purported rehabilitation. (Dkt. No. 113 at 9.) The Government is correct that COVID-19, of course, did not feature in the BOP appeal that concluded on July 12, 2019. But Ms. Gluzman's 2019 request gave both the warden of FMC Carswell and the administrator for BOP's National Inmate Appeals the opportunity to fully consider Ms. Gluzman's medical conditions and age—the same conditions presented here. COVID-19 only aggravates her circumstances for those exact reasons. Furthermore, the Court's decision today (as explained below) does not rely primarily on COVID-19 as the reason for compassionate release. COVID-19 is an aggravator, not a dispositive factor, for the Court's conclusion.

The Government is incorrect that Ms. Gluzman's 2019 application did not give the BOP the opportunity to consider her "purported rehabilitation." (Dkt. No. 113 at 5.) Her request enclosed a letter from Dr. Russ Wood, her former clinical psychologist, that discussed her "numerous prosocial activities" and her "attempt[s] to help those that she viewed as being less fortunate than herself." (Dkt. No. 107, Exh. 33.) It also included a letter from Reverend Robert G. Danage stating that Ms. Gluzman "is able to live a crime free life," is "determined and resolute about making good on her faith commitment," and that "she desires to pour her life into the lives of others especially individuals who are at risk for criminal behavior in hopes of turning their lives around by sharing her experience." (*Id.*) Moreover, as the Government itself points out, "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for

25

[compassionate release]."  (Dkt. No. 113 at 15 (quoting Application Note 3, U.S.S.G. § 1B1.13).)
The Court therefore rejects the idea that any of Ms. Gluzman's assertions regarding rehabilitation
are unexhausted.

 For the foregoing reasons, Ms. Gluzman has satisfied the 18 U.S.C. § 3582(c) exhaustion
requirement.  The Court proceeds to the merits.

## 2.  Extraordinary and Compelling Reasons

 18 U.S.C. § 3582(c)(1)(A)(i) requires courts to find that "extraordinary and compelling
reasons" warrant a sentence reduction.  Under the same section, courts are directed to ensure that
any reduction is "consistent with applicable policy statements issued by the Sentencing
Commission."  *Id.*  Section 1B1.13 of the Sentencing Guidelines sets forth the applicable
statements, outlining the circumstances under which "extraordinary and compelling reasons
exist."  U.S.S.G. § 1B1.13.  Before consulting those, however, the Court takes a moment to
address the applicability of the BOP's Program Statement.

 The Program Statement is inapplicable.  As outlined above, the Court's power to modify
an imposed sentence derives from statute.  "Statutory construction begins with the plain text[.]"
*United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003).  The plain text of 18 U.S.C. § 3582(c)
requires courts to consider "the factors set forth in section 3553(a)" and "applicable policy
statements issued by the Sentencing Commission."  It does not direct courts to consult BOP
guidance.  *Accord Ebbers*, 432 F. Supp. 3d at 427 n.6 (S.D.N.Y. 2020) ("[B]ecause no statute
directs the Court to consult the BOP's rules or guidelines . . . and no statute delegates authority
to the BOP to define the statutory requirements for compassionate release, the Court finds the
BOP Guidelines to be inapposite.") (internal citation omitted).  "Indeed, the BOP's rules conflict
with the [Sentencing Commission's]."  *Id.*  "The BOP limits 'extraordinary or compelling

26

circumstances' to those 'which could not reasonably have been foreseen by the court at the time

of sentencing,' 28 C.F.R. § 571.60, but the [Sentencing Commission] has stated the opposite . . .

.'" *Id.* (citing Application Note 2, U.S.S.G. § 1B1.13).

Deferring to the Program Statement for a definition of "extraordinary and compelling

reasons" would also frustrate a key purpose of the First Step Act, which was to give courts the

independent power to modify an imposed sentence—even in circumstances where the BOP does

not believe a modification is warranted.   *See Gotti*, 433 F. Supp. 3d at 614 ("Until [December

2018], a court could not modify a defendant's duly-imposed sentence on compassionate release

grounds unless it received a motion from the Bureau of Prisons asking that the court consider

such modification."); *United States v. Beck*, 425 F. Supp. 3d 573, 587 (M.D.N.C. June 28, 2019)

("[T]he terms of the First Step Act give courts independent authority to grant motions for

compassionate release and says nothing about deference to BOP, thus establishing that Congress

wants courts to take a *de novo* look at compassionate release motions.").

For those reasons, the Court does not consider the Program Statement to bind its decision

in any respect.  The Court now turns to the relevant provisions of U.S.S.G. § 1B1.13, which will

be addressed as three separate categories: (1) medical condition; (2) age; and (3) other factors.

### A.  Medical Condition of the Defendant

Application Note 1 to U.S.S.G. § 1B1.13 provides that extraordinary and

compelling reasons exist when

(A) . . .

(ii) [t]he defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.*

The Government concedes, as it must, that Ms. Gluzman "has a number of serious medical conditions." (Dkt. No. 113 at 10.) As detailed above, Ms. Gluzman suffers from Parkinson's disease, a "chronic progressive disorder" that interferes with her motor functioning. (Dkt. No. 112.) She also continues to suffer from the neurological consequences of her many strokes, which diminish her spacial orientation, cause problems with depth perception, and cause misjudgment in movement and balance. (*Id.*) Additionally, Ms. Gluzman has been diagnosed with basal cell carcinoma, a form of skin cancer, on her scalp. (Dkt. No. 107, Exh. 10.) She reports that it causes her pain. (Dkt. No. 112.) Ms. Gluzman has also experienced medical problems with her eyes. In 2018, she had surgery to remove a cataract on her right eye. (Dkt. No. 107, Exh. 7.) She has not had surgery to remove the left cataract because if she does, she will be unable to see close objects clearly; the BOP will only purchase a monofocal lens for her rather than a multifocal lens, due to cost constraints. (*Id.*; *id.*, Exh. 3.) It is also noteworthy that Ms. Gluzman is in a position where "she can either treat her Parkinson's disease or she can treat her depression." (*Id.*, Exh. 10.) The reason is that the BOP has precluded her from taking any psychiatric medication while she takes Rasagiline to treat her Parkinsonian symptoms. (Dkt. No. 112.) Dr. Feuer has opined that the "there are other pharmacological treatment options available to treat Ms. Gluzman's Parkinson's symptoms that would still allow for her to be treated with the appropriate psychiatric medication[.]" (*Id.*) Yet such options are apparently not available within the prison environment and therefore, Ms. Gluzman must continue to suffer from her depression

and other mental health conditions without pharmacological support.  In sum, Ms. Gluzman has "serious physical or medical condition[s] . . . from which . . . she is not expected to recover." Application Note 3, U.S.S.G. § 1B1.13.

At issue is whether they "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility."  *Id.*  "[A] defendant need not have lost all ability to provide self-care" to satisfy this criterion.  *Ebbers*, 432 F. Supp. 3d at 428.  Ms. Gluzman's "wheelchair-bound status," "left-sided motor deficit," "weakness to left-side extremities," "misjudgment in movement and balance," and loss of "depth perception" demonstrate that her capacity to sustain her own health has been significantly compromised. (Dkt. No. 112.)  Ms. Gluzman self-reports an "inability to care properly for [her]self" and "frequently having to rely on help [from her] sick roommates to get dressed, to put stockings [on], [and] to hook up [her] oxygen machine[.]"  (Dkt. No. 107, Exh. 33.)  She describes "days when [she] just lay[s] in bed w/o ability to move[.]"  (*Id.*)  Additionally, the Court finds it "highly pertinent" that her conditions "require frequent monitoring, evaluation, and treatment." *United States v. McGraw*, 2019 WL 2059488, at *4 (S.D. Ind. May 9, 2019).  While the record does not supply specific examples of self-care activities (bathing, eating, etc.) that Ms. Gluzman is absolutely unable to perform without assistance, it does not need to.  The Court reaches its finding of substantial diminution in ability to provide self-care based on the medical evidence. *United States v. Perez*, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (finding that "recent surgeries, . . . persistent pain[,] and vision complications . . . satisfy that requirement").

The Government's argument hangs on two faulty hooks.  First, the Government suggests that *because* both the warden of FMC Carswell and the administrator for BOP's National Inmate Appeals determined that Ms. Gluzman, based on her medical history, does not have a

"debilitated medical condition," she does not.  (Dkt. No. 113 at 9.)  But "the Court may," and here does, "independently evaluate whether [the defendant] has raised an extraordinary and compelling reason for compassionate release."  *Lisi*, 2020 WL 881994, at *3.  Second, the Government argues that Ms. Gluzman does not meet the Section 1B1.13 criteria because she does not satisfy the Program Statement's definition of those criteria: that a person be "[c]apable of only limited self-care" and "confined to a bed or chair more than 50% of waking hours."  Program Statement at 5.  As explained above, the Program Statement does not bind this Court's interpretation of the Sentencing Guidelines.  Whether or not Ms. Gluzman meets the Program Statement's definition, the Court concludes that she *does* meet the applicable requirement under the Sentencing Guidelines.

Accordingly, the Court finds that extraordinary and compelling reasons exist in this case because Ms. Gluzman is suffering from a serious physical or medical condition that substantially diminishes her ability to provide self-care within the environment of the correctional facility and from which she is not expected to recover.

### B.  Age of the Defendant

Application Note 1 to U.S.S.G. § 1B1.13 provides that extraordinary and compelling reasons exist when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  The first and third of those criteria are not in dispute.  Ms. Gluzman is 71 years old and she has served 24 years of her sentence.  Turning to the second criterion, the Court has already made clear that it considers Ms. Gluzman to be "experiencing a serious deterioration in physical or mental health."  Application Note 1 to U.S.S.G. § 1B1.13.  The remaining question is whether that is "because of

30

the aging process." *Id.*

There are several things that this plain text does not require.  The text does not require that the defendant be *only* suffering from serious medical conditions that are attributable to the aging process; put differently, the text of Section 1B1.13 admits of the possibility that a defendant is suffering simultaneously from both age-related medical deterioration and non-age-related medical deterioration.  Relatedly, the text does not require that the defendant's medical condition be caused by the aging process; it requires that *deterioration* be caused by the aging process.  In other words, a defendant could satisfy this criterion if she developed a medical condition in her youth that worsened, because of the aging process, to the point where she was experiencing "serious deterioration in physical or mental health." *Id.*

The Government paints an incomplete picture when it asserts that Ms. Gluzman's Acute CVA was caused by "an unfortunate side effect of a prescription medication" when she was 52 years old.  (Dkt. No. 113 at 11.)   Ms. Gluzman is correct to note that the "prescription medication" was one for menopause, which is health condition that occurs "because of the aging process." (*Id.* at 10–11.)  As a matter of but-for causation, the Acute CVA was attributable to the aging process.  The sequelae of Ms. Gluzman's strokes include weakness to left-side extremities, abnormal sensations on the left side of the body, spacial disorientation (including problems with depth perception), loss of the ability to know where the body is oriented in its surroundings, and misjudgment in movement and balance.  (Dkt. No. 112.)

More importantly, however, Ms. Gluzman has separately been given a diagnosis of Parkinson's disease.  While her parkinsonism is "compounded by a chronic stroke syndrome with neurological and medical sequelae and other chronic general medical conditions," Parkinson's disease constitutes an independent cause of deterioration in Ms. Gluzman's medical

31

condition.  (Dkt. No. 112.)  The record does not state definitively that Parkinson's was caused by the aging process.  (*See id.* (Parkinson's is a "complex disorder").)  But it does not need to. Parkinson's is a "progressive" illness and the medical records indicate that it has gotten worse for Ms. Gluzman as her years living with it have accumulated—the accumulation of those years being, by another name, "the aging process."  (*Id.*; Application Note 1, U.S.S.G. § 1B1.13.)

Even aside from Parkinson's disease and the stroke sequelae, the record evidence of Ms. Gluzman's cataracts makes clear that they are age-related.  (Dkt. No. 107, Exh. 7 ("Age related cataract").)  Clinical encounters have also revealed "age related" musculoskeletal changes" and related "chronic pain issues."  (Dkt. No. 113, Exh. F; *see also id.* ("walking with cane. age related changes").)  The Court concludes that Ms. Gluzman is experiencing a serious deterioration in physical or mental health because of the aging process.

### C.  Other Reasons

As detailed above, there is no language in the newly-amended 18 U.S.C. § 3582(c) that requires courts to defer to the BOP on the question of whether extraordinary and compelling reasons warrant a sentence reduction.  Still, the statute provides that such a reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1).  Section 1B1.13 of the Sentencing Guidelines has not been amended since the enactment of the First Step Act.  *See United States v. Torres*, 2020 WL 2815003, at *8 (S.D.N.Y. June 1, 2020).  The very first sentence of Section 1B1.13 reveals its outdatedness.  It states that, "*[u]pon motion of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."  U.S.S.G. § 1B1.13 (emphasis added).  But as emphasized above, the statutory language now permits courts to reduce a term of imprisonment *without* a motion from the Director of the BOP.  The outdatedness of Section 1B1.13 persists

32

through its later sections.  Of particular relevance is subsection (D) in Application Note 1, which states that "extraordinary and compelling reasons exist" when, "[*a*]*s determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  Application Note 1, U.S.S.G. § 1B1.13 (emphasis added).

The Court finds itself in alignment with the "majority of district courts" by concluding that "the amendments made to 18 U.S.C. § 3582(c)(1)(A) grant this Court the same discretion as that previously give[n] to the BOP Director."  *Torres*, 2020 WL 2815003, at *8 (quoting *Lisi*, 2020 WL 881994, at *3); *accord United States v. Daugerdas*, 2020 WL 2097653, at *2 (S.D.N.Y. May 1, 2020); *United States v. Pinto-Thomaz*, 2020 WL 1845875, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Genovese*, 2020 WL 4004164, at *3 (S.D.N.Y. July 15, 2020).  The BOP is simply no longer the "gatekeeper of the catch-all category."  *Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).  Accordingly, the Court itself now turns to the question of whether there exists in Ms. Gluzman's case "an extraordinary and compelling reason other than, or in combination with" her medical condition and age.  Application Note 1, U.S.S.G. § 1B1.13.

Ms. Gluzman asserts two additional bases for finding extraordinary and compelling reasons.  First, given her age and underlying medical conditions, she argues that she is at an especially high risk of suffering serious, if not fatal, medical complications should she contract COVID-19.  (Dkt. No. 107 at 20.)  Second, "in light of Ms. Gluzman's exemplary conduct while incarcerated and good moral character," she argues that she "is deserving of mercy."  (*Id.*)  While neither basis is independently dispositive of the Court's determination, the Court considers both, in conjunction with the factors laid out above, to be unique and powerful arguments for a sentence reduction.

33

By this point in the country's experience with this pandemic, no one can meaningfully

dispute that Ms. Gluzman's age and medical conditions raise her risk of contracting COVID-19.

*See* Centers for Disease Control and Prevention ("CDC"), *Older Adults*,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

(discussing risk increase as a result of age); CDC, *People of Any Age with Underlying Medical*

*Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

medical-conditions.html (discussing risk increase as a result of medical conditions including

cancer and neurologic conditions).  It is similarly well-established that, despite the BOP's best

efforts, there are significant "limitations in a prison environment (even a prison medical center)

on practicing the hygienic and social distancing techniques that the Center for Disease Control

has put in place to prevent rapid transmission." *Resnick*, 2020 WL 1651508, at *7.  The Court

recognizes the steps that BOP has taken to protect incarcerated individuals from contracting

COVID-19.  (Dkt. No. 113 at 12–13.)  Still, "COVID-19 cases have spread within the prison

system." *United States v. Castillo*, 2020 WL 2820401, at *1 (S.D. Tex. May 29, 2020).[3]

According to the BOP's website at the time of this writing, 514 inmates at FMC Carswell have

tested positive for coronavirus.  "COVID-19 Cases," Bureau of Prisons,

https://www.bop.gov/coronavirus/.  Four have recovered.  *Id.*  Three have died.  *Id.*  Coronavirus

conditions, although not independently dispositive, constitute a strong reason to reduce Ms.

Gluzman's sentence.

    As the Government itself points out, "rehabilitation of the defendant is not, by itself, an

extraordinary and compelling reason for [compassionate release]."  (Dkt. No. 113 at 15 (quoting

Application Note 3, U.S.S.G. § 1B1.13).)  But it counts in Ms. Gluzman's favor.  As a woman

_____

[3] Ms. Gluzman's motion advises that Ms. Gluzman is "housed very close" to "a former
roommate" of "the first FMC Carswell inmate to die from COVID-19."  (Dkt. No. 107 at 25–26.)

34

who entered prison with no significant hope of release, she has dedicated remarkable efforts to improving others' lives. She has volunteered her time assisting women who were studying for the GED, helped organize worship services, and served as a spiritual mentor to individuals who were in need of guidance. None of that, it bears emphasizing, diminishes the atrocity of her violence. Still, as Judge Parker advised at Ms. Gluzman's sentencing, "there is always considerably more to every human being than the worse thing they may have done." (Dkt. No. 107, Exh. 6.) During Ms. Gluzman's years of incarceration, she has demonstrated indeed how much "more" is within her. (*Id.*) The Court believes that her years of service to her community while incarcerated counsel in favor of a sentence reduction.

Based on all the above, the Court finds that extraordinary and compelling reasons exist to support a sentence modification for Ms. Gluzman.

## 3.  Section 3142(g) Factors

Where extraordinary and compelling reasons exist, U.S.S.G. § 1B1.13(2) still requires courts to find that the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." The relevant factors set out in Section 3142(g) are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . .
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . .
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

The Sentencing Commission has found that violent offenders recidivate at a

higher rate than non-violent offenders.  *See* U.S. Sentencing Comm., *Recidivism Among Federal Violent Offenders* (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf.  But the circumstances of Ms. Gluzman's crime imply that she was motivated by context-specific factors that no longer exist.  Specifically, the record suggests that her decision to murder was one motivated by the desire to kill a particular person.  Further, the decision to murder her husband appears to have been driven by anger relating to her husband's extramarital relationship, position in the divorce negotiations, or behavior as a partner—context-specific factors.  The Government has not presented any evidence to suggest that Ms. Gluzman has displayed violence outside of this single brutal act.  Nevertheless, given the jury verdict and based on the Government's submission and the PSR, the weight of the evidence against her appears to have been strong.

The remaining factors compel the Court to conclude that the defendant is not a danger to the safety of any other person or to the community.  U.S.S.G. § 1B1.13(2).  The Court credits the letters received from Dr. Harvey A. Rosenstock, a board-certified psychiatrist with over 40 years of experience; Dr. Russ Wood, a clinical psychologist who has worked for the BOP for over 24 years; and Reverend Robert G. Danage, who has known Ms. Gluzman since 2006, which state opinions that Ms. Gluzman does not present a danger to the safety of others.  (Dkt. No. 107, Exh. 22; *id.*, Exh. 20; *id.*, Exh. 23.)  Ms. Gluzman's record of compassionate and selfless acts throughout her 24 years of incarceration supports those opinions.  Additionally, it is well-established that older offenders are significantly less likely to recidivate than younger offenders.  *See* U.S. Sentencing Comm., *The Effects of Aging on Recidivism Among Federal Offenders* (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/researchpublications/2017/20171207_Recidivism-Age.pdf ("Over an eight-year

follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested

compared to 67.6 percent of offenders younger than age 21 at the time of release.").  The

Sentencing Commission has also consistently found that "incarceration lengths

of more than 120 months ha[ve] a deterrent effect."  *See* U.S. Sentencing Comm., *Length of*

*Incarceration and Recidivism* (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2020/20200429_Recidivism-SentLength.pdf.  Ms. Gluzman's

compromised medical condition too suggests that she is less likely to recidivate.

      After considering all factors under 18 U.S.C. § 3142(g), the Court concludes that Ms.

Gluzman is not a danger to the safety of any other person or to the community.  U.S.S.G. §

1B1.13(2).

### 4.  Section 3553(a) Factors

      Finally, 18 U.S.C. § 3582(c)(1)(A) requires courts to consider the factors set forth in 18

U.S.C. § 3553(a) before granting a sentence reduction.  In relevant part, those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of
> defendant as set forth in the guidelines . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a).

Many of these have been discussed above.  Still, the Court makes the following findings.
Shortening Ms. Gluzman's sentence from a life term of imprisonment to a term of approximately
24 years, with Ms. Gluzman being released at the age of approximately 71, is appropriate in light
of the nature and characteristics of the offense and the history and characteristics of the
defendant.  *See* 18 U.S.C. § 3553(a)(1).[4]

Without question, the nature and circumstances of Ms. Gluzman's crime were abhorrent.[5]
To quote her son, what she did was "horrendous."  (Dkt. No. 116, Exh. A.)  Ilan rightly points
out that the Court is granting Ms. Gluzman the opportunity to spend her "Golden years" in
freedom while she robbed her husband—Ilan's father, and a beloved friend to many—of the
chance to spend his anywhere.  (*Id.*)  Ilan's powerful letter highlights the destruction that Ms.
Gluzman's act has wrought on his family.  (*Id.*)  And Ilan makes the tragic observation that Mr.
Gluzman's potential scientific contributions are a loss suffered immeasurably broadly,
particularly during this global health crisis.  (*Id.*)[6]  Ms. Gluzman planned the murder in advance,

_____

[4] The life expectancy for women in the United States is approximately 81.  *See* CDC, *United States Life Tables, 2017*, https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf.  But "[l]ife expectancy within federal prison is considerably shortened."  *United States v. Taveras*, 436 F. Supp. 2d 493, 500 (E.D.N.Y. 2006) (citation omitted), *aff'd in part, vacated in part on other grounds sub nom*, 514 F.3d 193 (2d Cir. 2008).

[5] The Government spends several paragraphs of its letter articulating the gruesome details of Ms. Gluzman's crime, making the point that "[i]t is the stuff of horror films and nightmares."  (Dkt. No. 113 at 15–16 ("clutching the brutal instruments—two axes and an expensive kitchen knife— that they would use to do the job in their latex-gloved hands"); *id.* ("the defendant finished Yakov off with a kitchen knife"); ("dismembered Yakov's body with a hacksaw").)  The Government, in a remarkably insensitive turn of phrase, distinguishes this crime from a "run of the mill murder."  (*Id*. at 16.)  The record evidence indicates that Ms. Gluzman endeavored to kill her husband expeditiously with the tools she had available and then dispose of the body—not prolong his suffering.  The grotesque details of her method may well be suitable for "horror films" but their entertainment value is not germane to the Court's assessment of the Section 3553(a) factors.

[6] That said, the Court does not measure the relative value of a human life.  There is no evidence that Ms. Gluzman committed her crime to deprive the public and the scientific community of the contributions her husband would make.  Her crime would have been equally horrendous and

coerced a vulnerable accomplice, and dehumanized her victim's body. Then she planned to flee. Her conduct was appalling. And, as Judge Parker remarked at sentencing, the "whole affair is a great tragedy." (Dkt. No. 107, Exh. 6.)[7]

Consistent with that, Ms. Gluzman has served 24 years of her life in a federal penitentiary. Such a lengthy period of time reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). It also affords adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). As noted above, it has also served to protect the public from further crimes of Ms. Gluzman (to the point where she no longer presents a safety risk), 18 U.S.C. § 3553(a)(2)(C), and it has provided Ms. Gluzman with significant opportunities for educational and character growth—opportunities that she has seized. 18 U.S.C. § 3553(a)(2)(D).[8]

The need to "provide" Ms. Gluzman "with needed . . . medical care" counsels in favor of early release because the record suggests that release is the only way for her to obtain the eye and mental health treatment she seeks. *Id.* Importantly, Ms. Gluzman's younger sister, Marianna Rabinovitch, has promised to "make sure that [Ms. Gluzman] receives the care and attention that she needs" if she is released. (Dkt. No. 107, Exh. 36.) Ms. Rabinovitch will "rent an apartment for Rita close to [Ms. Rabinovitch's] home and pay for the services of a home health aid to help care for Rita." (*Id.*) She will "make sure that Rita obtains the best medical care for her many

---

would have caused equal harm to friends and family had her victim not been illustrious.

[7] The Government highlights that Ms. Gluzman's crime occurred in a "quiet, suburban part of Rockland County." (Dkt. No. 113 at 16.) Murder is murder, whether it happens in quiet suburbia or loud downtown. The Court rejects any suggestion that her crime is somehow worse for having disrupted the privileged peace of the neighborhood in which it was committed.

[8] The Government devotes an entire section of its brief to the argument that Ms. Gluzman has "expressed no remorse for her crimes." (Dkt. No 113 at 16–17.) For that argument, it relies on the arguments Ms. Gluzman's *lawyer* made in his motion. But Ms. Gluzman—who has maintained her innocence throughout—is entitled to vigorous advocacy no less than any other defendant. She received it. She will not be penalized for it.

serious health issues."  (*Id.*)

To sum, Ms. Gluzman has served a sentence that is "sufficient" to achieve the purposes outlined under 18 U.S.C. § 3553(a)(1)–(2); a longer sentence would be "greater than necessary." 18 U.S.C. § 3553(a).

The factors under 18 U.S.C. § 3553(a)(3), (4), and (6) concern sentencing comparisons. Of particular concern to the Court is 18 U.S.C. § 3553(a)(6), which addresses sentencing disparities.[9]  Ms. Gluzman, prosecuted in the federal system, was handed a lifetime sentence under the then-mandatory Sentencing Guidelines.  (*See* Dkt. No. 107, Exh. 6 (Judge Parker announcing "the sentence that must be imposed").  The sentencing court was not obligated, as district courts now are, to "make an individualized assessment based on the facts presented and impose a sentence "sufficient, but not greater than necessary" to satisfy the purposes of criminal sentencing."  *Gall v. United States*, 552 U.S. 38, 50 (2007); 18 U.S.C. 3553(a).  Nor is there any reason to believe that the sentence then imposed reflected a determination by the court that a life sentence was required to vindicate the purposes of the criminal law.  Without contradiction from the Government, Ms. Gluzman has represented that in New York State, persons convicted of intentional murder have been paroled, on average, after serving about 26 years.  (Dkt. No. 107 at 3 (citing N.Y. State Corr. & Cmty. Supervision, *Releases and Discharges from Incarceration Report*, at 8 (2018),

https://doccs.ny.gov/system/files/documents/2019/09/Releases-andDischarges-

---

[9] The Court is less persuaded by the disparity between Ms. Gluzman's sentence and Zelenin's, for substantially the reasons articulated by the Government—namely, that Zelenin cooperated with the Government, apparently did not plan the crime, was recruited by Ms. Gluzman, and committed the criminal conduct under direction from Ms. Gluzman.  (Dkt. No. 113 at 17.)

fromIncarcerationReport.pdf.)[10]  This is unsurprising.  "Federal sentences are generally higher

than state sentences."  *United States v. Brennan*, 468 F. Supp. 2d 400, 407 (E.D.N.Y. 2007)

(Weinstein, J.).

Concededly, the Second Circuit has "observed that requiring district courts to reduce a

defendant's sentence whenever he 'might have been subjected to different penalties had he been

prosecuted in state court would make federal sentences dependent on the law of the state in

which the sentencing court was located, resulting in federal sentencing that would vary from

state to state.'"  *United States v. Johnson*, 505 F.3d 120, 123 (2d Cir. 2007) (quoting *United

States v. Haynes*, 985 F.2d 65, 70 (2d Cir. 1993)).  Still, as the law stands in the Second Circuit,

courts are permitted to consider "federal/state sentencing disparities" when analyzing 18 U.S.C.

§ 3553(a)(6).  *Id.* at 123 n.4.  And as Judge Weinstein explained, the "public and criminals

generally consider the local federal and state courts as part of a single protective institution. Too

great a disparity between state and federal prosecution and sentencing decisions will be seen by

the public as creating unjustified disparities."  *Brennan*, 468 F. Supp. 2d at 407.  The Court

believes that it is particularly appropriate and important to do so here, when the federal

government obtained jurisdiction over Ms. Gluzman's prosecution only by the happenstance that

she traveled a short distance across the border from New Jersey to New York in order to commit

the crime.[11]  Had Mr. Gluzman happened to move to an apartment in New Jersey, and had Ms.

---

[10] According to a report from the Bureau of Justice Statistics, "[t]he [median] time served by
state prisoners released in 2016, from their date of initial admission to their date of initial release,
was . . . 13.4 years for murder."  U.S. Dep't of Justice, Office of Justice Programs. Bureau of
Justice Statistics, *Time Served in State Prison* (2016),
https://www.bjs.gov/content/pub/pdf/tssp16.pdf.
[11] Scholars have expressed the concern that federalization of criminal law over the past several
decades has heightened the risk that defendants will receive drastically different sentences for the
same conduct.  *See* Sara Sun Beale, *Too Many and Yet Too Few: New Principles to Define the
Proper Limits for Federal Criminal Jurisdiction*, 46 Hastings L.J. 979, 997 (1995) ("Dual

Gluzman committed the exact same acts, it is highly likely that her sentence would have been shorter. The Court's assessment of 18 U.S.C. § 3553(a)(6) therefore counsels a sentence reduction.

## CONCLUSION

For the foregoing reasons, Ms. Gluzman's motion for compassionate release (Dkt. No. 107) is GRANTED. An order directing the BOP to release Ms. Gluzman will issue no later than July 28, 2020. Counsel are directed to confer regarding proposed release conditions and to jointly submit to the Court a proposed order (or competing proposed orders, if no agreement can be reached) by noon on July 27, 2020.

SO ORDERED.

Dated: July 23, 2020
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

jurisdiction means that offenders are subject to a kind of cruel lottery, in which a small minority of the persons who commit a particular offense is selected for federal prosecution and subjected to much harsher sentences."); William J. Stuntz, *Unequal Justice*, 121 Harv. L. Rev. 1969, 2027 (2008) (discussing causes and effects of comparatively severe federal criminal law).